LEV L. DASSIN
Acting United States Attorney for the
Southern District of New York
By: JEANNETTE A. VARGAS
    TARA LAMORTE
    LI YU
Assistant United States Attorneys
86 Chambers Street, Third Floor
New York, New York 10007
Telephone: (212) 637-2678/2746
Facsimile: (212) 637-2702

- and –

John J. Rapisardi
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, New York  10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666
Email: john.rapisardi@cwt.com


**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------ x
                                                                          ::
 In re:                                                                   ::    09-cv-4743 (LAP)
                                                                          ::
 Chrysler LLC, *et al.*,                                                  ::    Bankruptcy Court Index
                                                                          ::    No. 09-B-50002 (AJG)
                                              Debtors.                    ::
                                                                          ::    (Jointly Administered)
------------------------------------------------------------------------ x


**OBJECTION OF THE UNITED STATES DEPARTMENT OF THE TREASURY TO**
**MOTION BY INDIANA INVESTORS TO WITHDRAW THE REFERENCE**

         The United States of America, through the United States Department of the

Treasury (the "The Treasury Department"), by its attorney, Acting United States Attorney Lev L.

Dassin, submits this objection to the motion ("Motion") of the Indiana State Teachers Retirement

Fund, Indiana State Police Pension Trust, and the Indiana Major Moves Construction Fund (collectively, "Movants" or "Indiana Investors") to withdraw the reference made to the United States Bankruptcy Court with respect to (i) the motion of Chrysler LLC and its affiliated debtors and debtors in possession (collectively, "Chrysler" or the "Debtors") to sell substantially all of their assets pursuant to section 363 of the Bankruptcy Code (the "Sale Motion")[1] and (ii) the motion of the Indiana Investors for appointment of a trustee and examiner in the Debtors' chapter 11 cases pursuant to sections 1104 and 1112(b) of the Bankruptcy Code (the "Trustee Motion").[2]

## Preliminary Statement

1.      The Treasury Department opposes the Motion.  Put simply, it is nothing more than a last-ditch, eleventh-hour effort by a dissident faction of the Debtors' senior secured lenders to obstruct and impede core matters in Chrysler's chapter 11 cases from being heard in bankruptcy court, which is the proper forum for resolution of those matters. This dissident faction consists of a group of three retirement investment funds in Indiana, allegedly holding approximately $40 million of the Debtors' senior debt – or less than 1% of the total.

2.      This faction's attempt to hold up Chrysler's chapter 11 proceedings should be denied.  The importance of Chrysler's chapter 11 cases is well-known, but bear emphasis: they were commenced in part to effectuate a sale transaction that will preserve thousands of jobs, billions of dollars in tax revenue and an iconic American company in an iconic American industry.  And, in the proceedings below, Chrysler has demonstrated through overwhelming

---

[1] A copy of the Sale Motion is attached as Exhibit E to the Declaration of Li Yu, dated May 22, 2009.

[2] A copy of the Trustee Motion is attached as Exhibit Q to the Declaration of Todd A. Gluckman, dated May 19, 2009 ("Gluckman Declaration").

evidence that this sale hearing must be held by June 1, 2009. Put simply, a delay beyond that point will inflict massive economic damage on Chrysler's stakeholders.

        3.    Since Chrysler filed its chapter 11 cases on April 30, great progress has been made toward achieving Chrysler's goal. Chrysler has obtained court approval of a $4.96 billion secured loan from the Treasury Department and its Canadian co-lender, Export Development Canada (which is not bound by the laws referenced by the Indiana Investors). It also obtained approval of procedures to sell Chrysler, and a hearing date of May 27, 2009, on the proposed sale of Chrysler assets to the Treasury Department, Fiat and the United Auto Workers. If the sale is approved on that date, it is expected to be closed by May 29, 2009, and the launch of a new Chrysler achieved.

        4.    At every step of the way since April 30 (and, in fact, well before then), Chrysler has been very clear that it needed funding from the Treasury Department to survive and achieve its goals, as that was the sole source of funding available. It has been equally clear that, in lending to Chrysler and in proposing to own the assets of New Chrysler, the Treasury Department relied, in substantial part, on the authority granted to it by the Emergency Economic Stabilization Act of 2008 ("EESA"), 12 U.S.C. §§ 5201 et seq., which established the Troubled Asset Relief Program ("TARP"). Only now, however, at this very late moment have the Indiana Investors emerged to contest the Treasury Department's legal authority to fund Chrysler.

        5.    One vehicle for this attack is the Motion. In the first instance, the Motion is untimely: the law is clear and well-established that a party must bring a motion to withdraw the reference as soon as soon as possible after the moving party has notice of the grounds for withdrawing the reference. Indeed, 28 U.S.C. § 157(d) expressly requires a motion to withdraw the reference to be "timely." Failure to move to withdraw immediately renders such a motion to withdraw untimely. Here, the Indiana Investors waited more than three weeks after they

received notice of grounds for withdrawing the reference.  Specifically, Movants failed to move to withdraw the reference in the face of the following undisputed facts :

- On April 30, 2009, the Treasury Department filed a Statement in Support of Chrysler's Chapter 11 cases that made clear that the Treasury Department intended to lend billions of dollars to Chrysler under the authority granted by EESA and would further provide a loan to facilitate the purchase of Chrysler's assets using TARP funds;

- On May 1, 2009, Chrysler filed a motion to approve interim and final debtor in possession ("DIP") financing (the "DIP Loans" or the "DIP Financing") from the Treasury Department, which funding similarly used TARP funds;

- On May 3, 2009, Chrysler filed a motion to approve bidding and sale procedures for a sale of certain Chrysler assets;

- On May 4, 2009, the bankruptcy court held a lengthy and contested hearing on the Debtors' motion for interim DIP financing, which was approved over certain objections from parties similarly situated to the Indiana Investors;

- On May 5, 2009, the bankruptcy court held a lengthy and contested hearing on the Debtors' motion for approval of sale and bidding procedures, which was approved over certain objections from parties similarly situated to the Indiana Investors; and

- On May 15, 2009, the deadline passed to object to final approval of the Debtors' DIP Financing.  Approximately 10 parties objected, but not the Movants.

6.    Notably, parties similarly situated to the Indiana Investors (and represented by the same counsel) objected to the interim DIP financing and sale and bidding procedures on the grounds that the Treasury Department lacked statutory authority under EESA to enter into the relevant transactions.  Each of these events put Movants on full notice of the existence of the EESA and TARP issues they now raise.  But for nearly three weeks, Movants failed to move to withdraw the reference.  Instead, they waited hoping to achieve a tactical advantage by filing a last minute motion to withdraw.  Courts have repeatedly held that this type

of gamesmanship is improper. As set forth in more detail below, district courts routinely deny motions to withdraw the reference as untimely where they "involve very clear indications of tactical delays and forum shopping after the bankruptcy judge made intermittent findings adverse to the moving party." In re VWE Group, Inc., 359 B.R. 441, 447 (Bankr. S.D.N.Y. 2007).

7.    Second, even if the Indiana Investors get over this threshold issue, they are not entitled to withdrawal on the merits.  A district court must withdraw the reference when the issue before the court requires substantial and material consideration of non-bankruptcy federal law together with bankruptcy law.  While the Debtors will address this issue in greater detail, the proposed Sale Motion and Trustee Motion do not require the consideration of non-bankruptcy federal law and, though the facts relating to this case are undoubtedly unusual, these motions are nothing more than typical bankruptcy motions.  In considering the Sale Motion, the bankruptcy court needs to consider only whether the Debtors exercised their business judgment in determining to enter into the proposed sale and whether the other elements of section 363 of the Bankruptcy Code are met.  This requires no consideration of non-bankruptcy federal law.

8.    Further, Movants lack standing to challenge the Treasury Department's disbursement of TARP funds, either directly or in the guise of an objection to the Sale Motion.  It is well established that general allegations of government misconduct do not confer standing on any person absent an injury specific to that person; and the expenditure of public funds in an allegedly unlawful manner is not an injury sufficient to confer standing.  Movants also lack standing to collaterally attack the Treasury Department's exercise of authority under EESA because Movants do not seek to vindicate any interests served by that statute.  Because Movants lack standing, the bankruptcy court, in adjudicating the Sale Motion and Trustee Motion, need not even reach the substance of the Movants' arguments relating to EESA and TARP.  As no consideration of these non-bankruptcy federal laws is required, withdrawal is not warranted.

9.      For these reasons, the Court should not withdraw the reference and should leave the Sale Motion and Trustee Motion for consideration by the bankruptcy court.

**<u>Background</u>**

10.      To understand why the Indiana Investors' motion is an untimely gambit filed for the purpose of holding up the other parties in interest, it is critical to know the procedural history of the Debtors' chapter 11 cases. The Debtors commenced their chapter 11 cases on April 30, 2009.  Concurrently with the commencement of their cases, the Debtors announced a transaction by which many of their assets would be sold to buyers including the Treasury Department and Fiat, within 60 days (the "<u>Sale Transaction</u>").[3]  The Debtors demonstrated with overwhelming evidence the necessity of consummating the sale within that time frame.  The Debtors also demonstrated why it was necessary that a hearing to approve the sale be held by the bankruptcy court no later than June 1, 2009.  That same day, the Treasury Department disclosed in a public filing the role it would play in the Debtors' cases as DIP lender to the Debtors, partial owner of the proposed purchaser in the sale of the Debtors' assets and lender to the proposed purchaser.  The Treasury Department set forth in plain language the precise relevant statutory authority under which it is acting.  <u>See</u> Statement of the United States Department of the Treasury in Support of the Commencement of Chrysler LLC's Chapter 11 Case ("<u>Treasury Statement</u>"), attached as Exhibit N to the Gluckman Declaration.  Specifically, the Treasury Department made clear that it relied upon EESA as the statutory pursuant to which it would provide interim and final DIP funding to the Debtors, as well as enter into the agreement to purchase Chrysler's assets.  Of course, given that the Treasury Department had previously

---

[3] <u>See</u> "Declaration of Ronald E. Kolka In Support of First Day Pleadings," attached as Exhibit B to the Yu Declaration, at ¶ 13.

publicly invoked these statutes to authorize loans to Chrysler, this could not have come as a surprise to any interested party.  Nevertheless, no party moved to withdraw the reference at the outset of these cases.

11.     On May 1, 2009, the Debtors filed a motion seeking authority to obtain DIP financing from the Treasury Department ("DIP Motion"), and on May 3, 2009, the Debtors filed the Sale Motion for approval of the sale of substantially all of their assets to New Chrysler or a higher bidder.  The overwhelming majority of Chrysler's secured lenders (both in number and in the amount of debt held) did not oppose the relief sought by the Debtors.  A small group of secured lenders, represented by the Indiana Investors' counsel (but not including the Indiana Investors), objected to the entry of an order approving bidding procedures in connection with the sale, as well as entry of an interim order authorizing DIP financing, on the bases that, among other things, the proposed sale transaction through a direct or indirect use of EESA authority is unconstitutional, and the proposed DIP financing contemplates an unconstitutional application of EESA.[4]  Again, no party moved to withdraw the reference with respect to either one of these motions.  In fact, Movants did not oppose the bidding procedures or interim DIP financing at all.

12.     On May 4, 2009, a lengthy and contested hearing was held on the interim DIP Motion at which no party sought to withdraw the reference.  The bankruptcy court approved

---

[4] See "Objection Of Chrysler Non-TARP Lenders To The Motion Of Debtors And Debtors In Possession For Interim And Final Orders (A) Authorizing Them To Obtain Postpetition Financing; And (B) Granting Adequate Protection To Certain Prepetition Secured Parties," attached as Exhibit F to the Yu Declaration, at 19-22; "Preliminary Objection Of The Chrysler Non-TARP Lenders To Motion Of Debtors And Debtors In Possession, Pursuant To Sections 105, 363 And 365 Of The Bankruptcy Code And Bankruptcy Rules 2002, 6004 And 6006, For (I) An Order (A) Approving Bidding Procedures And Bidder Protections For The Sale Of Substantially All Of The Debtors' Operating Assets (B) Scheduling A Final Sale Hearing And (C) Approving The Form And Manner Of Notice Thereof; And (II) An Order (A) Authorizing The Sale Of Substantially All Of The Debtors' Operating Assets, Free And Clear Of Liens, Claims, Interests And Encumbrances, (B) Authorizing The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases In Connection Therewith And Related Procedures And (C) Granting Certain Related Relief," attached as Exhibit G to the Yu Declaration, at 8-11.

the DIP financing on an interim basis and scheduled a final hearing for May 20, 2009 and an objection deadline of May 15, 2009.[5]  Pursuant to the interim DIP order, the Treasury Department has agreed to loan $3.034 billion to the Debtors.  These loans were made pursuant to TARP and EESA.

13.    On May 7, 2009, the bankruptcy court signed an order approving bidding procedures for the proposed sale and scheduling a final hearing approving the sale for May 27, 2009.[6]  Again, it was abundantly clear that the Treasury Department intended to use TARP money to purchase New Chrysler.

14.    On or about May 15, 2009, approximately 10 parties filed objections to final approval of the DIP Financing.  None of those parties raised the issues now raised by the Indiana Investors and no party sought to withdraw the reference.  Moreover, the Indiana Investors failed to object.

15.    Between May 15 and approximately 11:30 p.m. on May 19 no party filed a motion to withdraw the reference.  Finally, late in the evening on May 19, 2009, and the early morning on May 20, prior to the final DIP hearing on May 20, 2009, Movants launched a barrage of motions designed to delay and obstruct the progress of the Debtors' cases.  Specifically, the filed 1) an objection to the Sale Motion asserting, among other things, that the Treasury

---

[5] See "Interim Order Pursuant To Bankruptcy Code Sections 105(a), 361, 362, 363, 364 And 507 And Bankruptcy Rules 2002, 4001 And 6004 (A) Approving A Dip Credit Facility And Authorizing The Debtors To Obtain Post-Petition Financing Pursuant Thereto, (B) Granting Related Liens And Super-Priority Status, (C) Granting Adequate Protection To Certain Pre-Petition Secured Parties, And (D) Scheduling A Final Hearing," attached as Exhibit I to the Yu Declaration.

[6] See "Order, Pursuant To Sections 105, 363 And 365 Of The Bankruptcy Code And Bankruptcy Rules 2002, 6004 And 6006, (A) Approving Bidding Procedures For The Sale Of Substantially All Of The Debtors' Assets, (B) Authorizing The Debtors To Provide Certain Bid Protections, (C) Scheduling A Final Hearing Approving The Sale Of Substantially All Of The Debtors' Assets And (D) Approving The Form And Manner Of Notice Thereof," attached as Exhibit J to the Yu Declaration.

Department is not authorized to extend the DIP Financing to the Debtors, or to participate in the sale transaction in the manner contemplated (the "Sale Objection"); 2) the Trustee Motion; 3) the Motion for withdrawal of reference; and 4) an emergency motion for stay of proceedings pending resolution of the Motion for withdrawal.

16.     At the final DIP hearing on May 20, the bankruptcy court held a hearing and entered its order approving the DIP financing on a final basis.[7]  Movants did not file any objection to final approval of the DIP financing.  Counsel for Movants appeared at this hearing and sought to "reserve" Movants' rights; that request was denied.

17.     Movants' emergency motion for stay was denied by the bankruptcy court following a hearing held the afternoon of May 20.[8]  Movants filed an emergency motion for stay of proceedings with the district court the same day.[9]

## Objection

### A.    Indiana Investors' Motion is Untimely

18.     Movants seek to withdraw the reference pursuant to 28 U.S.C. § 157(d). Their motion must be denied as untimely.  The plain text of the statute authorizing withdrawal of a referred bankruptcy case or proceeding requires that motions to withdraw the reference be "timely."  28 U.S.C. § 157(d).  Timeliness is a threshold issue and the first determination a court

---

[7] See "Final Order Pursuant To Bankruptcy Code Sections 105(A), 361, 362, 363, 364 And 507 And Bankruptcy Rules 2002, 4001 And 6004 (A) Approving A Dip Credit Facility And Authorizing The Debtors To Obtain Post-Petition Financing Pursuant Thereto, (B) Granting Related Liens And Super-Priority Status, And (C) Granting Adequate Protection To Certain Pre-Petition Secured Parties," attached as Exhibit K to the Yu Declaration.

[8] See In re Chrysler LLC, Case No. 09-5002 (AJG) Tr. 101-06 (May 20, 2009); "Order Denying Emergency Motion Of The Indiana Investors For Stay Of Proceedings Pending Determination Of Motion To Withdraw The Reference," attached as Exhibit L to the Yu Declaration.

[9] See "Notice Of Emergency Motion Of The Indiana Investors For Stay Of Related Proceedings In The Bankruptcy Court Pending Determination Of Motion To Withdraw The Reference" Civ. Case No. 09-civ-4743 (TPG) (May 20, 2009) (Docket No. 3).

must make in ruling upon such a motion.  In re Stavriotis, 111 B.R. 154 (N.D. Ill. 1990); Burger King Corp. v. B-K of Kansas, Inc., 64 B.R. 728 (D. Kan. 1986); In re TPI Intern. Airways, 222 B.R. 663 (S.D. Ga. 1998).

19.     A timely request for withdrawal is necessary to avoid delaying the expeditious administration of the estate.  In re American Community Services, Inc., 86 B.R. 681 (D. Utah 1988).  The requirement also "protect[s] the court and the parties in interest from useless costs and disarrangement of the calendar, and to prevent unnecessary delay and the use of stalling tactics."  In re Giorgio, 50 B.R. 327, 329 (D. R.I. 1985).  A court has the discretion to examine the timeliness of each reference-withdrawal request on a case-by-case basis.  In re Chemetco, Inc., 308 B.R. 339 (Bankr. S.D. Ill. 2004).  Fundamentally, powerful reasons of judicial economy and fairness to all parties mandate timeliness.  The timeliness requirement ensures that motions to withdraw the reference cannot be used to foster gamesmanship and bad faith litigation tactics.

1.     **The Indiana Investors Waived Their Right to Seek Withdrawal By Waiting Three Weeks After The Sale Transaction and DIP Financing Were Disclosed**

20.     It is well settled that a motion for withdrawal is untimely unless made "as soon as possible after the moving party has notice of the grounds for withdrawing the reference." Drew v. Worldcom, Inc., 2006 WL 2129309 at *2 (Bankr. S.D.N.Y. 2006) (internal quotation omitted).  Indeed, failure to move for withdrawal when the grounds first arise constitute a waiver of the right to mandatory withdrawal.  See Lowin v. Dayton Securities Assocs. (In re Securities Group 1980), 89 B.R. 196 (M.D. Fla. 1988).  As the court in In re Baldwin-United Corp., 43 B.R. 888 (Bankr. S.D. Ohio 1984), held in denying a motion for withdrawal as untimely, "[i]f [a party is] sincere in their desire to assert their rights under § 157(d), they could and should have acted immediately upon learning that the motion had been filed. Instead, they waited until three

10

days before the motion was to be heard," and seventeen days after the motion was filed.  Id. at 895.  See also Laine v. Gross, 128 B.R. 588 (D. Me. 1991) (defendant's right to mandatory withdrawal of reference waived as untimely where grounds for withdrawal were clear from the complaint and defendant did not request withdrawal until after bankruptcy court denied defendant's motion to dismiss); In re Stavriotis, 111 B.R. 154 (N.D. Ill. 1990) (same).  Likewise, Movants could and should have acted immediately upon learning that the DIP and Sale Motions had been filed.  Whether for tactical reasons or otherwise, time and time again, Movants failed to assert any purported rights under 28 U.S.C. § 157(d).  Thus, their motion is untimely.

21.    Timeliness of a motion to withdraw must be measured by the stage of the proceedings in the bankruptcy court.   130 Cong. Rec. S17, 154 (comments of Senator DeConcini); In re Baldwin-United Corp., 57 B.R. 751 (S.D. Ohio 1985); In re First Alliance Mortg. Co., 282 B.R. 894 (C.D. Cal. 2001); In re Securities Group 1980, 89 B.R. 192 (M.D. Fla. 1988).  As a bankruptcy proceeding becomes more developed, complicated, and involved, a court is more likely to find a motion untimely.  U.S. v. Kaplan, 146 B.R. 500, 503 (D. Mass. 1992).

22.    The facts of this case set forth above demonstrate that the Indiana Investors' current motion is untimely.  The Treasury Department announced in a statement filed with the bankruptcy court its reliance on TARP and EESA to fund the DIP and participate in the Sale on the very first day of the case, April 30.   The very next day, the Debtors sought approval of interim and final DIP financings which relied on TARP and EESA funding.  These statements and motions were filed with the bankruptcy court, made available on public websites and served upon parties in interest.  Moreover, Treasury's proposed post-petition financing of the Debtors and proposed participation in New Chrysler were widely reported in the media prior to and immediately upon the commencement of the Debtors' cases.  Movants were well aware of

Treasury's intended involvement, which they now assert is unconstitutional and unauthorized. However, rather than requesting withdrawal immediately, Movants waited three weeks, which is a very substantial period given the exigencies and accelerated timetable of the Debtors' chapter 11 cases.  In that time, the court gave final approval to approximately $3.98 billion in DIP Financing from the Treasury Department and its Canadian co-lender to the Debtors, bidding procedures were approved for the sale of substantially all of the Debtors' assets, the deadline for competing bids to be submitted has passed, and the final hearing on the sale is scheduled in just days.  Given such circumstances, Movants' Motion cannot be deemed timely.

23.     The fact that the hearing on the Sale Motion must occur next week is especially critical in determining the timeliness of Movants' motion.  The proximity of the motion to withdraw to a trial or hearing is highly relevant in determining whether a motion is untimely.  See In re Baldwin-United Corp., 57 B.R. 751, 754-755 (S.D. Ohio 1985); In re Fresh Approach, Inc., 51 B.R. 412 (Bankr. N.D. Tex. 1985) (motion untimely when filed two weeks after key pretrial decision in proceeding sought to be withdrawn).  For example, in In re Baldwin-United Corp., 43 B.R. 888, 894-95 (Bankr. S.D. Ohio 1984), a motion to withdraw the reference made seventeen days after notice of grounds for withdrawing the reference, and only three days before the relevant motion was to be heard, was determined to be untimely.  The timing of Movants' motion is similar, and the motion should similarly be denied.

24.     Further, in a Chapter 11 case, if a motion could have been filed earlier and it is filed at a time when it could delay and subsequently jeopardize the proceedings, the motion would not be timely.  See In re Baldwin-United Corp., 57 B.R. 751 (S.D. Ohio 1985) at 754-55. It cannot be denied that the sale hearing scheduled for May 27 is a critical step in these chapter 11 cases, or that Movants' motion could have been brought earlier.  As recognized by the bankruptcy court,

> The record clearly indicates that the conducting of the sale hearing on May 27th is imperative to the future of the debtor and any delay could result in substantial and irreparable harm to the debtor and the estate.  Moreover, staying the proceedings would vitiate several vital agreements negotiated amongst the debtor and various constituents, thereby augmenting the harm to the estate, should the sale hearing not go forward as contemplated.

In re Chrysler LLC, Case No. 09-50002 (AJG), Tr. at 105 (May 20, 2009), attached as Exhibit H to the Yu Declaration.  Accordingly, Movants' motion must be denied.

### 2. Seeking Withdrawal After Approval of the DIP Financing and Bidding Procedures is Untimely

25.     Not only is the motion untimely in light of the passage of time since the commencement of these cases, but it is untimely because it was filed after the Debtors received authorization from the bankruptcy court to receive TARP and EESA funding from the Treasury Department in the form of the DIP Loans.  Motions to withdraw are untimely where a party waits until the bankruptcy judge has made an adverse finding.  See In re New York Trap Rock Corp., 158 B.R. 574 (S.D.N.Y. 1993); In re Adelphi Inst., Inc., 112 B.R. 534 (S.D.N.Y. 1990); In re VWE Group, Inc., 359 B.R. 441, 447 (Bankr. S.D.N.Y. 2007) (holding untimely motions include those that "involved very clear indications of tactical delays and forum shopping after the bankruptcy judge made intermittent findings adverse to the moving party"); see also Laine v. Gross, 128 B.R. 588 (D. Me. 1991) (defendant's right to mandatory withdrawal of reference waived as untimely where grounds for withdrawal were clear from the complaint and defendant did not request withdrawal until after bankruptcy court denied defendant's motion to dismiss); In re Stavriotis, 111 B.R. 154 (N.D. Ill. 1990) (same).

26.     Moreover, because Movants failed to seek to withdraw the reference on the DIP motion in a timely manner (or even oppose it), the ship has effectively sailed with respect to the issues raised by Movants.  Chrysler has already received TARP and EESA funding

through the DIP financing.  Treasury's liens in connection with the DIP Loans rank ahead of Movants' unsecured deficiency claims.[10]  If Movants believed that withdrawal was necessary to determine whether the Treasury Department had the authority to lend to Chrysler, that argument should have been made when the Treasury Department first proposed to provide TARP money to Chrysler in connection with the motions to approve the DIP Loans.  However, Movants did not file a timely opposition to entry of either the interim or final order approving DIP Financing.  Now, they seek removal of these issues, in the face of adverse rulings from the bankruptcy court and in hopes of different results from the district court.  As stated in In re New York Trap Rock Corp., 158 B.R. at 577, "[f]orum shopping efforts pursued by awaiting a decision relevant to the merits and then bypassing or filing a motion to transfer should not be rewarded with success."

**B.     Withdrawal is Not Warranted On the Merits**

27.     Even if Movants' motion for withdrawal of reference was timely, mandatory withdrawal is not warranted because resolution of the Trustee Motion and the Sale Motion do not require resolution of the non-bankruptcy issues asserted by Movants.  In addition to timeliness, for withdrawal of the reference to be mandatory, resolution of the proceeding must require consideration of both the Bankruptcy Code and non-bankruptcy federal statutes.  28 U.S.C. § 157(d).  However, Section 157(d) has been "construed narrowly" by the Second Circuit.  In re Ionosphere Clubs, Inc., 922 F.2d 984, 995 (2d Cir. 1990).  Mandatory withdrawal of the reference is appropriate only if resolution of the Trustee Motion and the Sale Motion require substantial and material consideration, interpretation and application of federal non-bankruptcy

---

[10] As explained in the Debtors' opposition to the Motion, Indiana Investors have no standing to pursue any secured claims.

law.  In re Dana Corp., 379 B.R. 449, 453 (S.D.N.Y. 2007); In re Manhattan Invest. Fund Ltd., 343 B.R. 63 (S.D.N.Y. 2006).

28.    In other words, Section 157(d) "requires the court to look at the issues which are presented by the merits of the underlying claim and defense and not just whether non-title 11 issues are swirling around somewhere in the case."  In re Rimsat, Ltd., 196 B.R. 791, 799 (N.D. Ind. 1995).  Where non-bankruptcy issues are intertwined with, and not independent of, issues arising under the Bankrutpcy Code, then withdrawal of the reference is not appropriate. See In re Chadborne Industries, Ltd., 100 B.R. 663, 669 (S.D.N.Y. 1989).

29.    "In addition to the substantial and material consideration standard, a court should take into consideration whether the withdrawal motion is based upon speculation about federal issues which may or may not arise and may or may not be germane to resolution of core Code proceedings.  If such speculation could serve as a basis for withdrawal of the reference, this would be 'inconsistent with the purposes underlying the Bankruptcy Code and would encourage forum shopping in a manner Congress disdained when it sought to avoid 'creating a multiplicity of forums for the adjudication of part of a bankruptcy case.'"  In re Texaco Inc., 84 B.R. 911, 921 (S.D.N.Y. 1988).

### 1.    The Trustee Motion Does Not Implicate Any Non-Bankruptcy Law

30.    As stated by Movants in their Trustee Motion, determination of whether a trustee should be appointed turns upon whether a debtor has been fulfilling, and continue to be able to discharge, its fiduciary duties.  Trustee Motion, ¶¶ 28-29.  A trustee may also be appointed if the court finds substantial or continuing loss to or diminution of the estate, and the absence of a reasonable likelihood of rehabilitation.  11 U.S.C. § 1104(a)(3); see also Trustee Motion, ¶ 45.  Finally, Movants assert that the appointment of an examiner is mandatory in a case of this size because the Debtors have more than $5 million of qualifying debt.  Trustee

Motion, ¶ 54.  In other words, the standards for deciding the Trustee Motion revolve entirely around core bankruptcy matters.  28 U.S.C. § 157(b).  Determination of whether the Treasury Department has exceeded its authority under EESA and the constitution is wholly irrelevant to the adjudication of the Trustee Motion.  Accordingly, no basis exists for withdrawal of the Trustee Motion.

> **2.     The Sale Motion Must Be Determined Upon Standards Established Under Section 363**

31.     With respect to the Sale Motion, it is manifest that Movants' objections to the proposed sale arise primarily in bankruptcy.  As Movants explain, they object to the proposed sale because they allege 1) it constitutes an illegal *sub rosa* plan of reorganization; 2) it violates the "priority scheme established by the Bankruptcy Code"; 3) it would transfer Movants' collateral free and clear of their liens without satisfying sections 363(f)(2) or 363(f)(3) of the Bankruptcy Code; and 4) New Chrysler is not a purchaser in good faith under section 363(m) of the Bankruptcy Code.  Motion, ¶ 30.  The only issue of non-bankruptcy federal law that Movants even mention in connection with their objection to the sale is their claim that, by violating the "priority scheme established by the Bankruptcy Code," the proposed sale incidentally constitutes an unconstitutional taking.  Id.

32.     Each of the issues Movants raise can and will be resolved by the bankruptcy court under the standards applicable to section 363 of the Bankruptcy Code, and thus fall well within the particular expertise of the bankruptcy court.  As is uniformly acknowledged, the standard for approval of a sale of substantially all assets pursuant to section 363 rests upon the business judgment of the debtor and the existence of a good business reason for the sale.  See, e.g., Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1066, 1071 (2d Cir. 1983); In re Thomson McKinnon Secs., Inc., 120 B.R. 301, 307 (Bankr. S.D.N.Y.

1990); In re Crowthers McCall Pattern, Inc., 114 B.R. 877, 881-82 (Bankr. S.D.N.Y. 1990). Movants' allegations of bad faith and control by the Treasury Department over the Debtors are factual questions subsumed by the underlying inquiry under section 363, which is to be determined in accordance with bankruptcy law. Resolution of these factual questions does not implicate any non-bankruptcy federal law or provide any basis for withdrawal. Thus, no basis exists for withdrawal of the Sale Motion.

      **3.**    **Movants Lack Standing to Pursue Challenges to the Treasury Department's Actions**

      33.    Before the bankruptcy court could reach the merits of Movants' Sale Objection, the court must first determine that Movants had standing to raise their attenuated challenge to Treasury Department's commitment of funds under EESA. This threshold jurisdictional question is well within the bankruptcy court's authority to resolve. See, e.g., In re Rimsat, 196 B.R. at 797-98 (jurisdictional issue does not justify withdrawal of reference); In re CIS Corp., 140 B.R. 351, 353 (S.D.N.Y. 1992) (same). Because well-settled principles of standing establish that Movants do not, in fact, have standing to bring collateral attacks on Treasury's allocation of funds in the guise of an objection to a sale proceeding, it is extremely unlikely that the bankruptcy court would need to reach the merits of the issue of Treasury's authority under EESA. Such speculation cannot serve as the basis for withdrawal of the reference. In re Texaco Inc., 84 B.R. at 921.

      34.    The "irreducible constitutional minimum of standing contains three elements." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). First, Movants must demonstrate that they have suffered an "injury in fact," that is, an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Id. (internal citations omitted). Second, Movants must establish that there is a

causal connection between the asserted injury and the conduct complained of; in other words, the injury has to be "fairly . . . trace[able] to the challenged action . . . , and not . . . th[e] result [of] the independent action of some third party not before the court." Id. (internal citations omitted; alteration in original).  Third, Movants must demonstrate that it is "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." Id. at 561.

35.     It is well-established that generalized allegations of government misconduct do not confer standing on each and every citizen absent an injury specific to that person.  Hein v. Freedom From Religion Found., Inc., 551 U.S. 587, 127 S. Ct. 2553, 2563 (2007).  A court may not arrogate to itself the power to determine the "interests of the public at large," as to do so "would be[,] not to decide a judicial controversy, but to assume a position of authority over the governmental acts of another and co-equal department, an authority which plainly we do not possess." Id. (internal quotation marks omitted; alteration in original).  In short, it is a "basic constitutional principle that 'a plaintiff raising only a generally available grievance about government — claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large — does not state an Article III case or controversy.'" Id. at 2564.

36.     It is precisely such generalized grievances that Movants seek to air in the Sale Objection and Trustee Motion.  Specifically, in the Sale Objection, Movants primarily argue that the Treasury Department lacks statutory authority to commit TARP funds to the purchase of Chrysler's assets, as such funds may only be dispersed to "financial institutions." Objection, ¶¶ 35-43.  Yet as is clear from the foregoing discussion, "the expenditure of public funds in an allegedly [unlawful] manner is not an injury sufficient to confer standing, even though the

plaintiff contributes to the public coffers as a taxpayer." <u>Valley Forge Christian College v.</u> <u>Americans United for Separation of Church and State, Inc.</u>, 454 U.S. 464, 477 (1982).

37.     Movants' challenge to the actions of the Secretary of the Treasury Department in dispersing TARP funds is a classic instance of just such a generalized attack on a government expenditure program.  Indeed, the only district courts to have been presented with this issue squarely held that individual taxpayers allegedly aggrieved by Treasury's allocation of TARP funds lack standing to challenge the Secretary's exercise of his discretionary authority. <u>Schulz v. United States Federal Reserve Sys.</u>, 2009 WL 466385, No. 1:08-CV-991 (GLS/DRH) (N.D.N.Y. Feb. 24, 2009); <u>Henry Builders, Inc. v. United States</u>, 2009 WL 185419, No. 1:09-cv-0288-ENV (E.D.N.Y. Jan. 26, 2009).  Similarly, Movants in the instant case have no cognizable interest in any disbursement of TARP funds beyond that of any other member of the general public.

38.     Notably, Movants make no attempt to link their purported "injuries" to the Treasury Department's alleged misallocation of TARP funds.  Nor could they, as they have received substantial benefit from the Treasury Department's loans to the Debtors prior to and during these proceedings, loans to which the Movants did not object.  The bankruptcy court has previously found, after a lengthy evidentiary hearing, that the billions in DIP Financing provided by the Treasury Department have been all that stands between Chrysler and immediate liquidation.  Without doubt, such liquidation would have diminished the value of the very collateral that secures Movants' debt.  One could surmise that for this reason, Movants refrained from expressing concern regarding the Treasury Department's authority under EESA to loan money to Chrysler until after the funds were advanced.

39.     Similarly, Movants cannot identify any injury that is fairly traceable to the Treasury Department's allegedly unauthorized use of TARP funds to finance the purchase of

Chrysler's assets.  According to their motion, the only "injury" that Movants would suffer should the section 363 sale go forward is that they would receive a *pro rata* distribution from the $2 billion of sale proceeds to be provided by the Treasury Department.  The fact that Movants desire to receive more money from the Treasury Department in connection with the asset sale is hardly an injury that is fairly traceable to the Treasury Department's purportedly unauthorized use of TARP funds.

40.   Perhaps more fundamentally, Movants' collateral attack upon the Treasury Department's exercise of its statutory authority under EESA fails because Movants are not seeking to vindicate the interests served by the statute.  "A valid claim of standing rests upon more than [the] assertion of a [judicially] cognizable injury."  Harrington v. Bush, 553 F.2d 190, 206 n.68 (D.C. Cir. 1977).  Rather, the Court must also determine "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question."  Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 153 (1970).  This prudential limitation on standing, although not arising under Article III of the Constitution, is nonetheless a mandatory component in the standing analysis.  Tax Analysts & Advocates v. Blumenthal, 566 F.2d 130, 137 n.37 (D.C. Cir. 1977).  It ensures that the courts will not intervene "into legislative provinces that neither invite nor warrant judicial review. In limiting such intervention, the zone test furthers the general recognition of standing doctrine that courts should 'exercise self-restraint in the utilization of our power to negative the actions of the other branches.'"  Leaf Tobacco Exporters Ass'n, Inc. v. Block, 749 F.2d 1106, 1112 (4th Cir. 1984).

41.   Movants' alleged injury bears no relation to the interests that are to be served by section 5211 of the EESA.  Nothing in the language of the statute indicates that Congress, in limiting eligibility for TARP funds to financial institutions, as that term is defined

20

under EESA, was seeking to protect "the contract rights of senior lenders," Objection, ¶ 36. Section 5211 does not speak to the rights of senior lienholders --- it does not purport to regulate their activities, nor does section 5211 confer rights upon such senior lienholders.  11 U.S.C. § 5211.  Instead, the section speaks only to the authority and duties of the Secretary of the Treasury Department in purchasing troubled assets, id.  See Leaf Tobacco Exporters, 749 F.2d at 1113-14 (holding that plaintiffs did not fall within zone of interests protected by a statute when their interests were not regulated by the statute and the particular interest they asserted did not fall within the zone protected by the statute).

42.     Finally, an examination of the statutory scheme created by Congress evidences that Congress did not intend to confer rights upon such senior lenders to challenge the the Secretary's exercise of his discretionary authority to purchase troubled assets.  See, e.g., Block v. Community Nutrition Institute, 467 U.S. 340, 345-46 (1984) (examining statutory scheme to determine whether Congress intended to confer standing upon specific group to challenge agency action).  Notably, EESA explicitly limits judicial review of actions taken by the Secretary pursuant to his authority to purchase the assets of financial institutions:  "No injunction or other form of equitable relief shall be issued against the Secretary for actions pursuant to section 5211 . . . of this title, other than to remedy a violation of the Constitution."  12 U.S.C. § 5229(a)(2)(A).   Rather than permit aggrieved citizens to interfere with the Treasury Department's exercise of its authority to enter into time-critical purchase transactions, see 154 Cong. Rec. H10712-2 (daily ed. Oct. 3, 2008) (statement of Rep. Conyers), Congress chose instead to exercise direct oversight of the Secretary's exercise of authority to purchase troubled assets.  Accordingly, with only limited exceptions, before the Secretary may purchase the troubled assets of a financial institution, the Secretary must transmit to Congress a written determination that the purchase of such troubled assets is necessary to promote financial market

stability.  12 U.S.C. § 5202(9)(B).  From this statutory scheme, it is clear that Congress did not

intend to confer rights upon the secured creditors of purchased assets to challenge the Secretary's

exercise of authority under section 5211.

**<u>Conclusion</u>**

WHEREFORE, the Treasury Department respectfully requests the court deny

Indiana Investors' Motion to withdraw the reference and grant such other relief as is just.

Dated:     May 22, 2009
           New York, New York


                                        LEV L. DASSIN
                                        Acting United States Attorney for the
                                        Southern District of New York,
                                        Attorney for United States Department of
                                        Treasury

                              By:     ___/s/ Jeannette Vargas_____
                                        JEANNETTE A. VARGAS
                                        TARA LAMORTE
                                        LI YU
                                        Assistant United States Attorneys
                                        86 Chambers Street, Third Floor
                                        New York, New York 10007
                                        Telephone: (212) 637-2678/2746/2734
                                        Facsimile:  (212) 637-2702
                                        Email: Jeannette.Vargas@usdoj.gov
                                                 Tara.Lamorte2@usdoj.gov
                                                 Li.Yu@usdoj.gov

John J. Rapisardi
Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, New York 10281
Telephone:  (212) 504-6000
Facsimile:   (212) 504-6666
Email:  john.rapisardi@cwt.com

- Of Counsel to the Presidential
Task Force on the Auto Industry -